## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WBY, INC. d/b/a FOLLIES,

     Plaintiff,

            v.

CITY OF CHAMBLEE, GEORGIA, et al.,

     Defendants.

Civil Action No.
1:18-cv-02739-SDG

### ORDER

This matter is before the Court on Plaintiff WBY, Inc. d/b/a Follies' Motion for Partial Summary Judgment [ECF 84] and Defendants City of Chamblee, Robert Bodron, and Andrew Clark's Motion for Summary Judgment [ECF 85]. For the reasons stated below, Follies' motion is **DENIED** and Defendants' motion is **GRANTED**.

## I.     BACKGROUND

### A. Facts

The following facts are not in dispute. Follies is an adult entertainment nightclub located in Chamblee, Georgia that offers nude dancing and sells alcohol for consumption on the premises.[1] In 2014, the City of Chamblee annexed territory

---

[1]     ECF 105-1, ¶ 1.

from unincorporated DeKalb County, which included the sites where Follies and other alcohol-serving nightclubs operate.[2] Before the annexation, Chamblee required establishments selling alcohol for consumption on the premises to end alcohol sales at 2:00 am and to close entirely by 3:00 am.[3] An agreement between Follies and DeKalb County permitted Follies to sell alcohol until 3:55 am and remain open to the public until 4:55 am.[4] After the annexation of the territory in which Follies is located, Chamblee did not continue the hours-agreement between Follies and DeKalb County. However, it reached a compromise with Follies and allowed it to sell alcohol until 3:00 am and to close entirely by 3:30 am.[5] From 2014 through 2018, Follies obtained alcohol licenses from Chamblee under this new agreement.[6] These licenses clearly stated: "This license is mere privilege subject to revocation or annulment and any future ordinances which may be enacted by the City of Chamblee."[7]

---

[2]  *Id.* ¶ 2.

[3]  *Id.* ¶ 3.

[4]  *Id.* ¶ 4.

[5]  *Id.* ¶¶ 5–7.

[6]  *Id.* ¶ 8.

[7]  *Id.* ¶ 9.

In the three years following annexation of the unincorporated territory, Chamblee contends its compromises with Follies (and similar establishments) proved detrimental to the City.[8] A 2017 report showed that the annexation incorporated into Chamblee eleven establishments that routinely stayed open past midnight and permitted the consumption of alcohol.[9] After the annexation, Chamblee contends that it experienced an increase in the number of thefts, fights, assaults, and arrests in and around these establishments.[10] At the same time, areas surrounding Chamblee, such as Doraville and Sandy Springs, began requiring alcohol-serving establishments to close at 2:00 am. They experienced a decrease in police calls, violent crimes, and property crimes.[11] On February 20, 2018, the Chamblee City Council adopted Ordinance No. 754.[12] That Ordinance amended Section 6-152(a) of Chamblee's Alcohol Code to require establishments selling alcohol for consumption on premises to stop selling alcoholic beverages (i) at

---

[8]   *Id.* ¶¶ 11–12.

[9]   *Id.*

[10]   *Id.*

[11]   *Id.* ¶¶ 13–14.

[12]   *Id.* ¶ 18.

2:00 am on Monday through Saturday; and (ii) by 11:59 pm on Sunday.[13] Such establishments were also required to close to the public every day by 2:30 am.[14]

On February 17, 2018, Chamblee law enforcement officers, members of the DeKalb County Fire Marshals, and agents with the Georgia Department of Revenue engaged in an administrative inspection of Follies.[15] Defendants Robert Bodron and Andrew Clark were two of the four Chamblee police officers who assisted with this compliance check.[16] The inspection included 11 officers, agents, and fire marshals, and lasted approximately 55 minutes.[17] After the inspection, the state and local agencies issued Follies two citations for violations of the City's alcohol and fire codes.[18]

In October 2018, Chamblee further amended its Alcohol Code, removing a carve out that had permitted restaurants with alcohol licenses that served food 24-hours per day to remain open later than Follies.[19] As amended, Ordinance No. 754

---

[13]  *Id.* ¶ 20.

[14]  *Id.*

[15]  *Id.* ¶¶ 35–36.

[16]  *Id.* ¶¶ 37–38.

[17]  *Id.* ¶¶ 36–71.

[18]  *Id.*

[19]  *Id.* ¶ 21.

does not refer to establishments "regularly open 24 hours as a restaurant."[20]

## B. Procedural History

On June 5, 2018, Follies filed a six-count Complaint against Chamblee, Bodron, and Clark.[21] In Count I, Follies alleged that Defendants violated its Fourth Amendment rights by conducting an unreasonable search of its premises on February 17, 2018.[22] In Counts II through V, Follies alleged that Chamblee's adoption of Ordinance No. 754 violated its rights under the United States and Georgia constitutions.[23] Count VI asserted a claim for attorney's fees under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11.[24]

On June 11, 2018, the Court consolidated Follies' case with this action, originally brought by DeKalb Event Center, Inc. d/b/a Mansion Elan, which also

---

[20]  *Id*. ¶ 22.

[21]  *WBY, Inc. v. Chamblee, et al.*, N.D. Ga., Civ. A. No. 18-cv-02756, at ECF 1.

[22]  *Id.*

[23]  *Id.* at ECF 1, ¶¶ 46–49. Count II asserted a violation of Follies' First Amendment rights under the United States and Georgia constitutions [*Id*. ¶¶ 50–52]. Count III asserted a violation of Follies' substantive due process rights under the United States and Georgia constitutions [*Id*. ¶¶ 53–55]. Count IV asserted a violation of Follies' right to equal protection under the United States and Georgia constitutions [*Id*. ¶¶ 56–58]. Count V asserted a violation of the Takings Clause under the Georgia constitution [*Id*. ¶¶ 59–63].

[24]  *Id*. ¶¶ 64–65.

challenged the constitutionality of Ordinance No. 754.[25] On March 26, 2019, the Court granted Mansion Elan's voluntary motion to dismiss with prejudice,[26] leaving Follies as the sole remaining Plaintiff.

On August 12, 2019, Follies filed its Motion for Partial Summary Judgment[27] and Defendants filed their Motion for Summary Judgment.[28] Each side opposed the other's summary judgment motion.[29] Defendants filed a reply in support of their motion on October 11, 2019.[30] On November 21, 2019, the Court heard oral argument on the cross-motions.[31]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*,

---

[25]   ECF 8.

[26]   ECF 72.

[27]   ECF 84.

[28]   ECF 85.

[29]   ECF 98, 99.

[30]   ECF 105. Follies did not file a reply in support of its motion for partial summary judgment.

[31]   ECF 106.

477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.    FOLLIES IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT.

Follies seeks partial summary judgment on the sole issue of whether, under the Georgia Constitution, it possessed a vested property right in its 2018 alcohol license.[32] Follies argues its vested rights were "defined by the version of [Chamblee's Alcohol Code] in the books in December 2017."[33] According to Follies, Chamblee infringed these vested rights by adopting Ordinance No. 754 and subjecting Follies to its hours restrictions.[34] Chamblee, on the other hand, contends that Ordinance No. 754 did not annul or repeal Follies' alcohol license.[35] Chamblee recasts Follies' argument as a request for a "property interest in the code itself, *i.e.*, in the code as it existed when its alcohol license was granted."[36] Chamblee states such an argument is foreclosed by Georgia law and that the City was free to amend the code and to require Follies' compliance with it.[37]

---

[32]   ECF 84-2, at 7–8.

[33]   *Id*. at 8.

[34]   *Id*. at 8.

[35]   ECF 98, at 10.

[36]   *Id.*

[37]   *Id.* Chamblee also argues Follies does not have Article III standing to pursue its claims because Follies should have never obtained a 2018 alcohol license. Chamblee asserts that Follies engaged in a scheme to artificially inflate its food sales and submitted fraudulent food sales information to Chamblee [ECF 98, at 4]. Follies was issued an alcohol license based on its purported compliance with Chamblee's requirement that 50% of total sales be from food sales.

In an action premised on diversity of citizenship subject matter jurisdiction, a federal court "must apply the controlling substantive law of the state" in which it sits. *Cambridge Mut. Fire Ins. Co. v. City of Claxton, Ga.*, 720 F.2d 1230, 1232 (11th Cir. 1983) (*citing Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Thus, the Court must apply Georgia state law to the substantive issues underlying Follies' claims. As Follies acknowledges, the success of its motion depends on the Court's application of the Georgia Supreme Court's decision in *Goldrush II v. City of Marietta*, 482 S.E.2d 347 (Ga. 1997), and its progeny.

In *Goldrush II*, adult entertainment clubs challenged an amendment to the City of Marietta's local ordinances that prohibited them from selling alcohol. *Id.* at 351. The clubs argued they possessed a vested property right in the continued renewal of their alcohol licenses based on their previous renewals and significant expenditure of money. *Id.* This, the adult entertainment clubs argued, entitled them to due process of law and prevented Marietta from amending its ordinances

---

Chamblee presents evidence that Follies never met this threshold. Instead, Chamblee argues that Follies inflated its food sales by classifying a significant portion of the charges for alcoholic drinks as food. This increased Follies' "food" sales above the 50% threshold. As discussed further below, given Follies' lack of a vested property right in the license, the Court finds it unnecessary to determine the effect, if any, of this alleged scheme in resolving the pending motions.

to impede their ability to sell alcohol. *Id.* at 357.

Citing the United States Supreme Court's decision in *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), the Georgia Supreme Court stated that "to have a property interest . . . a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Goldrush II*, 482 S.E.2d at 358. The court held that, while parties can obtain vested rights by virtue of zoning laws, they cannot obtain a vested property right in an alcohol license. *Id.* at 359–61. The court concluded:

> The city code makes it clear that the Marietta licensees before us do not have a vested right in the law never changing, and are not exempt from the exercise of the city's police power by its elected officials to further an important governmental interest. In light of the above, the substantial reliance placed by appellants upon the renewal of their licenses, by constitutional standards, amounts only to a unilateral expectation . . . of renewal. Because appellants did not have a legitimate claim of entitlement to continued re-issuance of their annual licenses, they did not have a protectable property interest in their renewal.

*Id.* at 360 (internal citations omitted). Accordingly, the Georgia Supreme Court concluded local ordinances that affect alcohol licenses "enacted pursuant to the police power for the public's protection may be modified without violating a constitutional prohibition against retrospective statutes." *Id.* at 358.

While *Goldrush II* dealt with the annual renewal of an alcohol license, in *Quetgles v. City of Columbus*, the Georgia Supreme Court upheld a City of Columbus ordinance prohibiting one-on-one lingerie modeling sessions. 491 S.E.2d 778, 781 (Ga. 1997). Relying on *Goldrush II*, the court rejected a licensed adult business's argument that it possessed a vested right to continue this activity, despite the new regulation, because such activity was permitted when it was issued its business license. *Id*. The court held:

> [T]he procurement of a business license does not, by itself, give the license holder vested rights. Plaintiffs also have no vested right to offer one-on-one modeling—despite expenditures toward that end—because none of plaintiffs' licenses specifically permit one-on-one nude or semi-nude modeling or any other conduct prohibited by the ordinance. While plaintiffs may suffer economic injury in complying with the ordinance, they are still free to do business in accordance with the licenses they have been granted. The ordinance does not eliminate plaintiffs' businesses; it regulates their businesses by imposing a manner restriction on how plaintiffs can operate under their adult entertainment licenses.

*Id*. at 621. *See also S.J.T., Inc. v. Richmond Cty.*, 430 S.E.2d 726, 730 (Ga. 1993) ("[A]ppellants contend that the ordinance denies them due process of law . . . by depriving them of full use of the licenses issued them by the county. These arguments fail simply because the ordinance does not have the effects attributed to it by appellants. Appellants are free to continue conducting business as they

have been doing in accordance with the licenses they have been issued.").

Here, the undisputed evidence, coupled with the holdings of *Goldrush II* and *Quetgles*, requires the conclusion that Follies did not have a vested property right in the terms of the Chamblee Alcohol Code at the time Follies was issued its 2018 alcohol license. At best, Follies had a "unilateral expectation" or an "abstract need or desire" that it would be permitted to continue selling alcohol at the times allowed when it was issued its 2018 license. This is insufficient to create a vested property right, even if Follies expended money with hope that the regulations would remain the same. *Goldrush II*, 482 S.E.2d at 358. Moreover, it is dubious Follies could even have had a "unilateral expectation" that Chamblee's laws would never change since Chamblee's Alcohol Code—and Follies' alcohol license—both stated on their faces that the license was subject to any future ordinances that may be enacted.[38]

This case presents a less persuasive argument than even the one rejected in *Quetgles* because Ordinance No. 754 did not revoke or annul Follies' 2018 alcohol license. After the Ordinance's enactment, Follies was free to continue selling alcohol to the public throughout 2018. The Ordinance merely limited the hours

---

[38]   ECF 9-1, at 44 §§ 6–7.

during which Follies could sell alcohol and remain open to the public. While compliance with the Ordinance may have negatively impacted Follies' profits, such harm is insufficient to imbue Follies with a constitutional property right. *Quetgles*, 491 S.E.2d at 781 ("While plaintiffs may suffer economic injury in complying with the ordinance, they are still free to do business in accordance with the licenses they have been granted."). Simply put, Follies cannot claim a "vested right in the law never changing, and [is] not exempt from the exercise of the city's police power by its elected officials to further an important governmental interest." *Goldrush II*, 482 S.E.2d at 360.

Accordingly, Follies' Partial Motion for Summary Judgment [ECF 84] is **DENIED**.

## IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.

### A. Follies' Fourth Amendment Claim (Count I)

Follies alleges that Chamblee, Bodron, and Clark engaged in a warrantless police inspection that violated its Fourth Amendment rights as an unreasonable search. Generally, Follies alleges Clark and Bodron exceeded the scope of a warrantless administrative search and Chamblee routinely permitted such practices. Defendants argue (1) Bodron and Clark are protected from suit on qualified immunity grounds; and (2) Chamblee is protected from suit under the

Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 659 (1978).

> ### i.   Bodron and Clark are Entitled to Qualified Immunity.

The qualified immunity analysis involves a two-pronged approach. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Court must determine (1) whether there was a constitutional violation; and (2) whether that violation was of a clearly established Constitutional right. *Id.*

> ### 1.   Bodron and Clark Did Not Violate Follies' Fourth Amendment Rights.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its protections apply to "commercial premises, as well as to private homes." *New York v. Burger*, 482 U.S. 691, 699 (1987). In general, a search of a home or business must be based on a warrant supported by probable cause. *Id.* at 702. "The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir. 1995).

One of those limited exceptions involves administrative inspections of "closely regulated" industries. *See Burger*, 482 U.S. at 702. Because an owner or

operator of commercial property "has a reduced expectation of privacy" in this context, the standard for what may be reasonable under the Fourth Amendment is correspondingly broader. *See id.* at 702–03. The Eleventh Circuit recently held, and the parties do not dispute, that Follies is an adult entertainment club engaging in a "closely regulated" industry. *WBY, Inc. v. DeKalb Cty., Ga.*, 766 F. App'x 852, 858 (11th Cir. 2019). *See also Crosby v. Paulk*, 187 F.3d 1339, 1346 (11th Cir. 1999) ("The liquor industry long has been subject to close supervision and inspection.") (*citing Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970) (internal citations omitted)).

When a law authorizes warrantless inspections of closely regulated businesses, "but makes no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Bruce v. Beary*, 498 F.3d 1232, 1240 (11th Cir. 2007). To satisfy the Fourth Amendment, an administrative inspection must be "appropriately limited" in both scope and execution. *Id.* at 1239–40. *See Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). "As with any search, then, the scope and execution of an administrative inspection must be reasonable in order to be constitutional." *Id.* at 1244. *See also Donovan v. Dewey*, 452 U.S. 594, 598-99 (1981) ("[A]dministrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the

Fourth Amendment's requirement for reasonableness."). The Court "must examine the totality of the circumstances in order to determine whether an administrative inspection, just like any other search or seizure, is reasonable under the Fourth Amendment." *WBY, Inc.*, 766 F. App'x at 859 (*citing United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) ("It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment.")).

### a.  The Warrantless Inspection of Follies Was Not Pretextual.

It is undisputed that the Chamblee police officers had authority to perform a warrantless administrative inspection at Follies. Chamblee's Alcohol Code states:

> Sworn officers of the police department shall have the authority to inspect establishments licensed under this chapter during the hours in which the premises are open for business. These inspections shall be made for the purpose of verifying compliance with the requirements of this chapter and state law.[39]

Chamblee's adult entertainment establishments code specifically authorizes officers to inspect both the establishment itself and its employees.[40] Further,

---

[39]   ECF 9-1, at 3; ECF 85-18, at 8.

[40]   ECF 85-18, at 8–9 (*citing* ECF 85-13, Chamblee Adult Ests. Code § 22-109(a), (b),

Georgia state law authorizes the Department of Revenue to inspect alcohol establishments such as Follies:

> The commissioner and his agents may enter upon the licensed premises of any person engaged in the manufacture, transportation, distribution, sale, storage, or possession of alcoholic beverages at any time for the purpose of inspecting the premises and enforcing this title and shall have access during the inspection to all books, records, and supplies relating to the manufacture, transportation, distribution, sale, storage, or possession of alcoholic beverages.[41]

Finally, both Chamblee and DeKalb County law permits inspections of establishments such as Follies by the Fire Marshal to ensure compliance with the fire code.[42]

Follies argues that, while it may be subject to reasonable warrantless inspections under local and state law, the specific inspection at issue was an unconstitutional pretextual search investigating general criminality. Follies, however, points to no evidence in the record supporting this theory or that creates a genuine issue of material fact in this regard. In fact, the undisputed material evidence contradicts Follies' position.

---

(h), and (k)).

[41]   ECF 85-18, at 9 (*citing* Chamblee City Code § 38-3 & DeKalb County Code § 12-41(b)).

[42]   ECF 85-15, at 9.

The undisputed facts are as follows. On February 16, 2017, while assisting Georgia Department of Revenue agents in enforcement actions against other alcohol-serving establishments in Chamblee, Clark drove past Follies and noticed an abnormally high amount of vehicle and foot traffic outside and surrounding Follies.[43] From previous experience, Clark knew that overcrowding can present a serious problem at nightclubs like Follies.[44] In fact, in 2017 alone, Follies was cited twice for overcrowding violations.[45] Due to the overcrowding concern at Follies, Clark contacted the DeKalb County Fire Marshals, and Georgia Department of Revenue agents decided to engage in an undercover investigation of Follies.[46] While undercover, the agents observed other possible state and local code violations, including a Follies employee offering to sell them an entire bottle of liquor in violation of Chamblee's alcohol code.[47] Based on these observations, the three agencies decided to conduct an administrative inspection of Follies.[48]

---

[43]   ECF 105-1, ¶¶ 27–29.

[44]   *Id*. ¶ 30.

[45]   *Id*. ¶ 24.

[46]   *Id*. ¶¶ 31, 33.

[47]   ECF 58-9, at 7 (citing Chamblee Code § 6-148); ECF 105-1, ¶¶ 31–35.

[48]   ECF 105-1, ¶¶ 35–36. As stated above, this is not a situation that required the officers to obtain a warrant for the subsequent search. "Warrantless administrative inspections do not offend the Fourth Amendment if they are necessary in order to monitor closely regulated businesses for the purpose of

Follies fails to point to any evidence contradicting these facts or supporting its theory that the search was pretextual. Its reliance on conjecture and speculation is insufficient to create a genuine issue of material fact.

### b.  The Inspection of Follies Was Reasonable in Scope.

The Court is guided in its reasonableness inquiry by three Eleventh Circuit cases: (1) *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007); (2) *Crosby v. Paulk*, 187 F.3d 1339 (11th Cir. 1999); and (3) *WBY, Inc. v. DeKalb Cty., Georgia*, 766 F. App'x 852, 858 (11th Cir. 2019).

In *Crosby*, officers inspected an alcohol establishment after receiving numerous complaints of underaged drinking. 187 F.3d at 1348–49. Forty officers entered the establishment to check the identification of the nearly 400 patrons. *Id.*

---

learning whether a particular business is conforming to the statute regulating that business." *Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 945 (11th Cir. 2014) (declining to find warrantless administrative search pretextual when officer testified that he visited the nightclub "on official business" 100 times in a five-year span, including ten warrantless inspections). Follies' business includes at least three industries historically considered "closely regulated" for Fourth Amendment purposes. *E.g.*, *WBY*, 766 F. App'x. at 858 (11th Cir. 2019) (adult entertainment night clubs); *United States v. Hamad*, 809 F.3d 898, 905 (7th Cir. 2016) (tobacco); *Crosby*, 187 F.3d at 1346 (alcohol). Thus, officers did not need to procure a warrant to perform an administrative search at Follies. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("The businessman in a regulated industry in effect consents to the restrictions placed upon him.").

Officers were also posted at the exits to ensure none of the patrons left the premises before being searched. *Id*. The search resulted in 70 arrests and 54 convictions for underaged drinking. *Id*. at 1350 n.14. The Eleventh Circuit held that this administrative inspection was reasonable because: (1) the presence of 40 officers was proportionate to the officers' needs; (2) the officers did not carry heavy arms or point a firearm at anyone; (3) officers were accompanied by code compliance agents to enforce local and state law; (4) the operation resulted in numerous arrests; and (5) the search lasted only two hours. *Id*. at 1348–49.

Conversely, in *Bruce*, the Eleventh Circuit found the officers exceeded the scope of an administrative search. 498 F.3d at 1243–44. In *Bruce*, 20 officers inspected an auto salvage shop for possible ordinances violations. *Id*. The appellate court found this search to be unreasonable in scope because: (1) the officers arrived in unmarked cars and blocked all exits; (2) 20 officers were involved, including SWAT officers; (3) officers were armed with automatic weapons; (4) officers ordered all employees to stop working and line up along a fence; (5) officers searched areas of the property not relevant to their administrative purposes; and (6) the search lasted eight hours. *Id*. at 1244.

Recently, the Eleventh Circuit affirmed a jury verdict in favor of Follies concerning an unrelated administrative inspection by DeKalb County officers,

finding that the officers violated Follies' Fourth Amendment rights. *WBY, Inc.*, 766 F. App'x at 859.[49] The court found that the jury reasonably could have concluded that the purported administrative inspection of Follies on April 19, 2013 violated Follies' Fourth Amendment rights because: (1) the inspection involved 36 officers, including a SWAT unit and narcotics detectives; (2) the SWAT officers were armed with heavy firearms and wearing army fatigues and masks; (3) the officers yelled at, threatened, and directed profanities toward patrons and employees; (4) an officer shoved an employee and removed Follies' part-owner in a "pain hold" and refused to permit him to use the restroom despite his medical condition; (5) patrons were ordered to sit, be quiet, and not leave for at least 20 minutes; (6) all 55 of Follies' entertainers were ordered to line up, submit to individual photographs, and release their actual and stage names; (7) officers threw an entertainer to the floor and arrested her for talking on her wireless phone; and (8) operations at Follies were completely shut down, including turning on the house lights and shutting off the music, for approximately two hours. *Id.* at 861.

By contrast, the undisputed facts in this case are as follows. At 12:45 am on February 17, 2018, four Chamblee police officers—Azar, Bodron, Clark, and

---

[49]   Under Eleventh Circuit Rule 36-2, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."

Tran—five Georgia Department of Revenue agents, and two DeKalb County fire marshals arrived at Follies to perform their compliance check.[50] The Chamblee officers arrived in three vehicles: Azar parked a marked Chamblee Police SUV behind Follies; Bodron parked a marked Chamblee Police SUV in front of Follies; and Clark parked an unmarked car behind Bodron's SUV.[51] Chamblee officers did not use their blue emergency lights once parked at Follies and did not block vehicles from entering or leaving Follies.[52]

Immediately upon entering Follies, Chamblee officers informed the staff they were there to conduct a compliance check.[53] Two Chamblee officers, Azar and Tran, wore their patrol uniforms, while Bodron and Clark both wore cargo pants, a shirt, a jacket, a vest with pockets, and a holstered handgun.[54] None of the Chamblee officers wore masks.[55] None of the Chamblee officers carried any type

---

[50] ECF 105, ¶ 36–37.

[51] *Id*. ¶ 38.

[52] *Id*. ¶ 39. Defendants concede that the Department of Revenue agents continued to run the blue emergency lights on one of their vehicles once parked at Follies [ECF 85-8, ¶ 17].

[53] *Id*. ¶ 41.

[54] *Id*. ¶¶ 42–49.

[55] *Id*. ¶ 49. Defendants concede that at least two Georgia Department of Revenue agents, who had investigated Follies earlier in the night while undercover, wore masks [ECF 85-8, ¶ 22; ECF 85-9, ¶ 15].

of firearm except their standard-issue handguns.[56] None of the Chamblee officers unholstered or pointed a handgun at Follies' staff or patrons.[57] There is no evidence that any Chamblee officer directed foul, offensive, or threatening language at anyone.

Once inside Follies, the Chamblee officers assisted the Department of Revenue agents inspecting the premises for code violations; and the DeKalb County Fire Marshals in conducting a headcount of patrons.[58] Bodron also looked through a binder of Follies' employees' permits.[59] While the fire marshals conducted their count, Follies' employees were free to leave or return through the back door.[60] Patrons were not permitted to leave for approximately 20 minutes until the fire marshals concluded their occupancy count.[61] Follies' patrons were not directed to line up, remain stationary, patted down, or even questioned.[62] Neither the occupancy count nor the code inspection unreasonably altered the

---

[56] *Id.* ¶ 69.

[57] *Id.* ¶ 70.

[58] *Id.* ¶¶ 42, 44, 50.

[59] *Id.* ¶ 55.

[60] *Id.* ¶ 51–52.

[61] *Id.* ¶¶ 51–54.

[62] *Id.* ¶¶ 53–54.

usual conduct of Follies' business: the house lights were not turned on, the music continued to play, the dancers continued to perform, and Follies continued to serve alcohol to patrons.[63] After approximately 20 minutes, the fire marshals completed their occupancy check, determined Follies was within 10 of the 236-person occupancy limit for the building, and decided to not cite Follies or to conduct a more accurate check, as that would have required the patrons to leave the premises and substantially disrupted Follies' business.[64] At the conclusion of the inspection, Follies was issued two citations for improperly serving liquor and not properly maintaining its fire safety equipment.[65]

During the compliance check, Georgia Department of Revenue agents found a vending machine full of cigarettes, but could not locate a posted tobacco license as required by state law.[66] The Chamblee officers waited in Follies' lobby while the Department of Revenue agents searched for the tobacco license and determined what they would do with the tobacco vending machine.[67]

---

[63]   *Id.* ¶¶ 53–54.

[64]   *Id.* ¶¶ 57–58.

[65]   *Id.* ¶¶ 61–66. Follies later pled *nolo contendere* to the two citations. *Id.* ¶ 73.

[66]   *Id.* ¶ 67.

[67]   *Id.* ¶ 68.

Approximately 55 minutes after they arrived, all the officers, agents, and marshals departed Follies.[68]

Examining the totality of the circumstances, the facts in this case more closely resemble the reasonable administrative inspection found in *Crosby* and differ drastically from a "criminal raid" as found in *Bruce* and *WBY*. While Follies' may disagree with how or why the officers chose to conduct the inspection, it does not point to evidence creating a genuine issue of material fact in this regard. It is "not our role to tell local governments how to conduct an administrative search." *Crosby*, 187 F.3d at 1348. Thus, as a matter of law, the administrative inspection was reasonable in scope. Bodron and Clark did not violate Follies' Fourth Amendment rights.

### 2. Follies Cannot Point to a Clearly Established Right to Overcome Qualified Immunity.

Even assuming, *arguendo*, Bodron and Clark did violate Follies' Fourth Amendment rights, the officers are nonetheless entitled to summary judgment under the second prong of the qualified immunity analysis. For this analysis, the Court must look to United States Supreme Court, Eleventh Circuit, and Georgia Supreme Court precedent to establish if the law, at the time of the violation,

---

[68]   *Id.* ¶ 71.

provided "fair and clear warning" to a reasonable officer that his or her actions were unconstitutional. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). "For a constitutional right to be clearly established, it must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Crosby*, 187 F.3d at 1345 (internal citations omitted). "[T]he circumstances that confronted the government actor must have been materially similar to prior precedent to constitute clearly established law because public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Id.* (internal citations omitted). Indeed, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Id.*

Follies concedes that there is no case on point with the facts here.[69] But, Follies argues that "[c]ourts do not require a case directly on point."[70] Instead, according to Follies, "[t]his case . . . fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary."[71]

---

[69]     ECF 107.

[70]     ECF 99, at 2 (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[71]     ECF 84, 99.

The Court does not agree. The undisputed material facts here do not present "conduct so egregious that a constitutional right was clearly violated." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1292 (11th Cir. 2009). *See also Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be unreasonable within the meaning of the Fourth Amendment.") (internal citations omitted). The lack of a factually on-point case indicating that a clearly established constitutional right was violated is fatal to Follies' position. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("We have said many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (*quoting Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (internal citations omitted)).

Accordingly, Bodron and Clark are entitled to qualified immunity and the Court grants summary judgment on Count I in their favor.

### ii. Chamblee Is Entitled to Summary Judgment on Follies' Fourth Amendment Claim Under *Monell*.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court held that a county can only be liable under 28 U.S.C. § 1983 when its official policy

caused the constitutional violation. To prove an official county policy, a plaintiff must identify either (1) an officially promulgated policy, or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker. *Id*. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (*quoting City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).

Like Bodron and Clark, Chamblee is entitled to summary judgment because the undisputed material evidence demonstrates that Follies' Fourth Amendment rights were not violated in the first place. Moreover, even assuming a constitutional violation could be found, Follies' claim against Chamblee is barred by *Monell* because Follies does not present any evidence that Chamblee adopted a policy, practice, or custom that was the moving force behind the alleged constitutional violation. Follies also fails to identify a final policymaker responsible for any purported unofficial custom or practice that violated its constitutional rights. Follies points only to the unsupported allegations in its Complaint. Of course, at the summary judgment stage, bare reliance on a pleading is insufficient to defeat dismissal. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) ("[T]o defeat a motion for summary judgment, [plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor;

'[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient.'") (*quoting Anderson*, 477 U.S. at 252).

Accordingly, Chamblee is entitled to summary judgment on Count I.

### B. Chamblee Is Entitled to Summary Judgment on Follies' First Amendment Claim (Count II).

Follies failed to address its First Amendment claim in any of its summary judgment briefing.[72] During oral argument, Follies' counsel stated it is no longer pursuing that claim.[73] Since Follies has abandoned the claim, Chamblee is entitled to summary judgment on Count II.

### C. Chamblee Is Entitled to Summary Judgment on Follies' Due Process Claim (Count III).

Follies argues Chamblee violated its right to substantive due process because the original version of Ordinance No. 754, adopted in February 2018, distinguished between alcohol-licensed establishments regularly open 24-hours as a restaurant, and other alcohol-licensed establishments not open 24-hours such as Follies. This distinction did not permit 24-hour restaurants to serve alcohol at a later time than Follies. Instead, the original Ordinance permitted 24-hour

---

[72]   ECF 84, 99.

[73]   ECF 107.

restaurants to stay open and serve only food and non-alcoholic drinks after the time in which Follies was required to close to the public.

As an initial matter, Chamblee argues Follies' substantive due process argument is moot because Chamblee modified Ordinance No. 754 in October 2018 to remove the distinction between 24-hour restaurants and other alcohol-serving establishments.[74] Chamblee is correct that a change in the law can moot a claim for relief. *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004). However, "[t]he rule is that, when a plaintiff challenges the constitutionality of local ordinances, replacement of the ordinances usually moots the plaintiff's claims for prospective relief, but not his claims for damages." *Tokyo Gwinnett, LLC v. Gwinnett Cty., Georgia*, 669 F. App'x 531, 532 (11th Cir. 2016) (internal citations omitted). An amended ordinance cannot moot a retrospective damages claim because "those claims concern harm that, allegedly, was already caused by the old ordinances." *Id*. Thus, while Chamblee's amendment removed the distinction by which Follies was allegedly aggrieved and would moot any prospective claim, it did not moot any alleged harm Follies' claims occurred between June 2018 (when Chamblee began enforcing Ordinance No. 754)[75] and

---

[74]   ECF 10, at 15.

[75]   ECF 98-1, at 5.

October 2018 (when the Ordinance was modified and the distinction was removed). Thus, Follies' claim for damages during that period constitutes a justiciable controversy.

As explained above, Follies did not have a vested property right to use its 2018 alcohol license pursuant to the law only as it existed at the time the license was issued. Without a vested property right, Follies cannot prove its substantive due process claim. Even assuming, *arguendo*, Follies did have a vested property right at stake, its substantive due process claim would still fail.

"The substantive component of the Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (internal citations omitted). "Fundamental rights are those rights created by the Constitution . . . there is generally no substantive due process protection for state-created property rights." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014). However, "[w]here a person's state-created rights are infringed by a legislative act, the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action." *Id.* (internal citations omitted). "Substantive due process challenges that do not implicate fundamental rights are reviewed under the rational basis standard." *Id.* at 1280 (*citing Fresenius Med. Care*

*Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) ("When a challenged law does not infringe upon a fundamental right, we review substantive due process challenges under the rational basis standard.")). *See also Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1308 (11th Cir. 2009) ("Like equal protection claims, substantive due process claims are subject to rational basis review, so long as they do not infringe fundamental rights and are not discriminatory.").

The Eleventh Circuit has held that "there is no generalized right to associate in alcohol-purveying establishments with other adults." *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1338 (2002). The Georgia Supreme Court agrees that the regulation of alcohol does not implicate a protected class or fundamental right under Georgia law. *State v. Heretic, Inc.*, 588 S.E.2d 224, 225 (Ga. 2003) ("Because bar owners are not members of a suspect class, and because the right to sell alcoholic beverages is not a fundamental right, the challenged statutes are properly analyzed under the rational basis test."); *Consol. Gov't of Columbus v. Barwick*, 549 S.E.2d 73, 75 (Ga. 2001) ("Since appellee is not a member of a suspect class and operating a business which sells alcoholic beverages is not a fundamental right, we apply the rational basis test to determine if the favored classification . . . violates equal protection.").

"The rational basis test requires that an ordinance . . . be rationally related

to the achievement of a legitimate government purpose." *Gary*, 311 F.3d at 1338–39. When an economic or social legislation is challenged, "[t]he deference accorded to legislative enactments is very great." *Curse v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 843 F.2d 456, 463 (11th Cir. 1988). A court should not overturn the legislation "unless the varying treatment of different . . . persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Gary*, 311 F.3d at 1338–39. "[T]he burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (internal citations omitted).

Here, Ordinance No. 754's regulation of the hours in which an adult entertainment club could sell alcohol and remain open to the public passes constitutional muster under the rational review standard. Chamblee's time restraints are rationally related to its articulated interest in promoting safety, conserving public resources, and preventing crime. Follies fails to show that Chamblee's actions were irrational, or that any reasonably conceivable set of facts could not provide a rational basis for the classification. *Barwick*, 549 S.E.2d at 75 ("A city council in the exercise of its police power may formulate rules and

regulations for the licensing of the liquor business, even to the extent of prohibiting the licensed activity in a specified area.").

With regard to the 24-hour restaurant exclusion found in the original version of the Ordinance, Follies' argument is undermined by the fact that the Ordinance did not allow 24-hour restaurants to serve alcohol while preventing Follies from doing the same. Indeed, such 24-hour restaurants were required to stop selling alcohol at the exact same time as Follies. The only distinction was that 24-hour restaurants were permitted to stay open and serve food after Follies was required to close to the public. This distinction is particularly inconsequential because, as admitted by Follies' counsel during oral argument, Follies had no interest in remaining open 24-hours per day if it could not also serve alcohol.[76]

There is a rational basis for a city to distinguish between nightclubs like Follies and 24-hour restaurants. Nightclubs can pose special risks to public safety that restaurants only serving food do not. Moreover, as the Georgia Supreme Court stated in *Heretic*, Chamblee could have reasonably concluded 24-hour restaurants purely serving food should be excluded from the general closing time restrictions to promote the legislative goal of providing individuals a late-night

---

[76]   ECF 106.

place to eat and "enhance[e] the recreational atmosphere of that day." 588 S.E.2d at 225. "The legislature was also entitled to conclude that the health and safety risks posed by bars are more significant than those posed by restaurants . . . we need not necessarily agree with the soundness of the distinction maintained by the statutory scheme." *Id*. at 225–26.[77] Ordinance No. 754 passes the rational basis test.

### D. Chamblee Is Entitled to Summary Judgment on Follies' Equal Protection Claim (Count IV).

The parties agree that Follies abandoned its equal protection claim under the United States Constitution.[78] Thus, the Court's focus is solely on the remaining equal protection claim under the Georgia Constitution.[79]

---

[77] Follies admits it could not identify any alcohol-licensed establishments in Chamblee that were regularly open 24-hours per day as a restaurant [ECF 105, ¶ 30; ECF 85-13, at 9]. Without a similarly situated comparator, Follies cannot show an equal protection violation. *Campbell v. Rainbow City*, 434 F.3d 1306, 1313-14 (11th Cir. 2006).

[78] ECF 105, at 1.

[79] Since the Court is granting summary judgment in favor of Chamblee on all of Follies' federal law claims, there is no independent basis for original jurisdiction over Follies' state law claims. However, "[t]he dismissal of [p]laintiff's underlying federal question claim does not deprive the Court of supplemental jurisdiction over the remaining state law claims . . . the Court has the discretion . . . but is not required to dismiss the case." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997). "[C]onsiderations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Id*. at 1353. Here, the

Georgia's Equal Protection Clause states: "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." Ga. Const. art. I, § 1, ¶ II. "The Georgia equal protection clause, which is construed to be consistent with its federal counterpart, requires that the State treat similarly situated individuals in a similar manner." *City of Atl. v. Watson*, 475 S.E.2d 896, 899 (Ga. 1996). *See also Henry v. Georgia*, 434 S.E.2d 469, 470 (Ga. 1993) ("The equal protection clause of the Georgia Constitution is substantially equivalent to the equal protection clause of the fourteenth amendment of the U.S. Constitution.") (internal citations omitted). "A successful equal protection challenge generally requires a showing that state action was undertaken with an unreasonable purpose or was arbitrary and capricious." *Watson*, 475 S.E.2d at 899. If "there is no showing that the classification in this appeal involves either a suspect class or the exercise of a fundamental right," the Court "must examine it under the lesser rational basis test and determine only whether it bears a reasonable relationship to a legitimate purpose of government." *Id*.

---

Court finds the parties, Court, and interests of justice are best served by Follies' state law claims being adjudicated by this Court and exercises its discretion to retain jurisdiction. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

The Court analyzes Follies' due process claim under rational basis scrutiny because the ability to sell alcohol does not implicate a suspect class or fundamental right. *Gary*, 311 F.3d at 1338; *Heretic*, 588 S.E.2d at 225; *Barwick*, 549 S.E.2d at 75. As stated above, Chamblee's adoption of Ordinance No. 754 was rationally related to its legitimate interests in promoting safety, conserving public resources, and preventing crime. Follies does not demonstrate how Chamblee acted irrationally or arbitrarily in enacting Ordinance No. 754. Follies also fails to show that any reasonably conceivable set of facts would not provide a rational basis for the distinction in permissible hours of operation between Follies, an adult entertainment club, and a 24-hour restaurant. These same failures are fatal to Follies' equal protection claim under Georgia law. *Watson*, 475 S.E.2d at 899–900 ("A classification will be upheld in the face of an equal protection challenge so long as, under any conceivable set of facts, it bears a rational relationship to a legitimate end of government not prohibited by the Constitution.") (internal citations omitted).

Follies' reliance on *Love v. Georgia* is unpersuasive. 517 S.E.2d 53 (Ga. 1999). In *Love*, the Supreme Court of Georgia held that a statute regulating marijuana use and the operation of a vehicle was unconstitutional under the rational basis test as a denial of equal protection. *Id*. at 57. The statute provided that individuals who

legally ingested marijuana could not be convicted of driving while under the influence of marijuana, while individuals who illegally ingested marijuana could be convicted for the same action. *Id*. at 57. The court held this violated equal protection because:

> [T]he fact that the effects of legally-used marijuana are indistinguishable from the effects of illegally-used marijuana, we are unable to hold that the legislative distinction between users of legal and illegal marijuana is directly related to the public safety purpose of the legislation.

*Id*. Here, *Love* is unpersuasive because Follies, an adult entertainment club whose business is predicated on selling alcohol to patrons, and 24-hour restaurants serving food, are not similarly situated. The two businesses are not "*prima facie* identical in all relevant respects" as required for an equal protection violation. *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). Unlike Follies, these restaurants are devoted to selling food to customers around the clock, even after the time in which they are no longer permitted to serve alcohol. Thus, these two businesses are substantially dissimilar. Chamblee did not act irrationally by permitting 24-hour restaurants to remain open after the deadline to serve alcohol passed. *Xcaliber Int'l, Ltd. LLC v. Georgia ex rel. Carr*, 253 F. Supp. 3d 1220, 1228 (N.D. Ga. 2017) ("Different treatment of dissimilarly situated persons does not violate the equal protection clause.").

Moreover, Follies admits it could not identify any alcohol-licensed establishments in Chamblee that were regularly open 24-hours per day as a restaurant.[80] Without a similarly situated comparator, Follies cannot show an equal protection violation. *Campbell*, 434 F.3d at 1313-14. Thus, Chamblee is entitled to summary judgment on Count IV.

### E. Chamblee Is Entitled to Summary Judgment on Follies' Takings Claim Under the Georgia Constitution (Count V).

Follies failed to develop its takings claim under the Georgia Constitution in its briefs or at oral argument. In fact, Follies did not offer a responsive argument on this claim in its opposition to Chamblee's motion for summary judgment. As such, the Court is within its discretion to consider the claim abandoned. *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Nevertheless, "[a]n unconstitutional takings claim requires the taking of a valid property interest." *Layer v. Barrow Cnty.*, 778 S.E.2d 156, 159 (Ga. 2015). As stated above, under *Goldrush II* and its progeny, Follies' takings claim is foreclosed because it did not have a vested property right to use its 2018 alcohol license pursuant to the law only as it existed at the time it

---

[80]   ECF 105, ¶ 30; ECF 85-13, at 9.

was issued. Since Follies did not have a "valid property interest, the taking claim fails." *Layer*, 778 S.E.2d at 159. Thus, Chamblee is entitled to summary judgment on Count V.

### F.  Follies' Claims for Relief Are Limited by Justiciability Doctrines.

In its Complaint, Follies seeks declaratory, injunctive, and monetary relief for its alleged injuries in 2018.[81] The parties agree that Follies' claims for declaratory and injunctive relief are now moot.[82] Chamblee also argues that Follies' damages claims are nonjusticiable because (1) Follies' submission of its profits and loss statements was not a sufficient damages computation to satisfy the Federal Rules of Civil Procedure, and (2) Follies cannot recover alleged lost profits from alcohol sales in 2018 when it should not have been issued an alcohol license in the first place.[83] In light of the Court's foregoing conclusions dismissing Follies' causes of action, it is unnecessary to determine the viability of its damages claims.

---

[81]   *WBY, Inc. v. Chamblee, et al.*, No. 18-cv-02756, at ECF 1.

[82]   ECF 99, at 13 ("[T]he City is correct that Follies' claims for declaratory and injunctive relief are moot.").

[83]   ECF 85-18, at 17–19.

**V.      CONCLUSION**

Based on the foregoing, Follies' Partial Motion for Summary Judgment [ECF 84] is **DENIED** and Defendants' Motion for Summary Judgment [ECF 85] is **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of the Defendants and close the case.

**SO ORDERED** this the 16th day of January 2020.

_____
Steven D. Grimberg
United States District Court Judge